**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MICHAIN R. GUST
o/b/o N.J.D.P., a minor,**

     **Plaintiff,**

                                  **Civil Action 2:19-cv-03971**

     **v.**                            **Judge Michael H. Watson**

                                    **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

**REPORT AND RECOMMENDATION**

Michain R. Gust ("Plaintiff"), acting on behalf of N.J.P.D. ("Claimant"), a minor male, filed this action seeking review of a decision of the Commissioner of Social Security denying Claimant's application for supplemental security income. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that the Commissioner's determination be **AFFIRMED**.

**I.     BACKGROUND**

Plaintiff is Claimant's mother. Plaintiff filed an application for supplemental security income on Claimant's behalf on March 23, 2015, alleging that he became disabled on May 22, 2006. After initial administrative denials of the claim, an Administrative Law Judge ("ALJ") held a hearing on July 24, 2018. (Tr. at 37–79). Plaintiff and Claimant, represented by counsel, appeared and testified in person and a medical expert testified via telephone. (*Id*.). The ALJ issued a decision denying benefits on August 29, 2018. (Tr. 12–36). On July 9, 2019, the Appeals Council denied review of the claim, making the ALJ's determination the Commissioner's final determination. (Tr. at 1–6). Plaintiff timely commenced this action seeking review of that

determination.  Pending before the Court is Plaintiff's Statement of Specific Errors (Doc. 10), Defendant's Memorandum in Opposition (Doc. 11), and the administrative record (Doc. 9).

### A.    Lay Testimony at the Hearing

At the July 24, 2018, hearing, Claimant testified that he was twelve years old and going into the seventh grade.  (Tr. at 43–44).  Claimant described that he was placed in smaller classrooms for some of his classes.  (Tr. at 44).  He stated that he had attended an on-line school for most of his sixth-grade school year because he had previously been expelled. (Tr. at 54).  After the on-line school closed, Claimant returned to a brick-and-mortar school in February of 2018. (Tr. at 54–55).  Although his last two weeks at that school went well, he got in trouble for wandering the halls, going to detention too much, cursing at teachers, not doing work, and walking out of his classroom.  (Tr. at 45, 54).  He explained that he had done these things because he did not like working with teachers and he did not like doing work most of the time.  (Tr. at 46). Claimant testified that he would get in trouble three days a week and that Plaintiff often had to come take him out of school.  (Tr. at 55).  He reported getting detentions once or twice a day.  (Tr. at 57).  He was unhappy with his grades that year.  (Tr. at 46).  Teachers would need to redirect him back to doing schoolwork a couple of times at least once or twice a day.  (Tr. at 56–57). Claimant agreed that it was difficult for him to focus on his work most of the time.  (Tr. at 57). Claimant also described having temper tantrums at school in past years where he would make big messes and that he once threw a chair.  (Tr. at 55–56).  Claimant did not have such outburst in sixth grade, however, and instead left his classrooms and ignored his teachers.  (Tr. at 56). Claimant indicated that he played basketball during basketball season and that he enjoyed videogames including Fortnite and that he would play Fortnite for two to three hours at a time. (Tr. at 47–49).

Plaintiff also testified at the hearing. Plaintiff indicated that Claimant had conflicts with peers and teachers. (Tr. at 60–61). Plaintiff further testified that she had to take precautionary safety measures with Claimant including keeping knives out of his reach and keeping him away from fire. (Tr. at 63). It was a chore to get Claimant to do things like brush his teeth or take a shower and he needed constant reinforcement or redirecting to do simple things like shower or put on clean clothes. (*Id*.). Claimant would do homework and chores if he wanted to do. (Tr. at 64). Plaintiff was specifically asked if Claimant had a hard time focusing. (Tr. at 64). She responded: "Focusing, concentrating. That, and it's – you know, I just don't know if it's the authority thing, I don't know if it's the impulsiveness, I don't know if it's – I think it's a combination of many things. (*Id*.).

### B.    Education-Related Records

Education records indicate that Claimant attended multiple schools from kindergarten through second grade and that he was enrolled in the third grade at Buckeye Woods Elementary School on September 1, 2014. (Tr. at 421). The records also reflect that in February of 2015, Claimant's teachers at Buckeye Woods referred Claimant for special services evaluation because he had been exhibiting behaviors that impeded his classroom and academic performance. (Tr. at 406). In February and March of 2015, Claimant was suspended three times for behavior problems, including destruction of school property and aggressive behavior towards staff, such as kneeing the principal in the chest and brandishing a broken pencil like a weapon. (Tr. at 357–59). Claimant's mother, Plaintiff, also sought to have Claimant evaluated. (Tr. at 417).

On April 13, 2015, a school psychologist wrote an assessment based on a review of Claimant's records and her observations during testing. (Tr. 565–72). She noted that the available records generally indicated that Claimant had average to above average grades before he enrolled

at Buckeye Woods.  (Tr. at 566).  In addition, the school psychologist noted that Claimant scored in the average range for all areas on a general intelligence test and that he had average scores in all areas on achievement tests except for the area of written expression.  (Tr. at 568).  The school psychologist noted that on a behavioral assessment scale, Claimant's mother rated Claimant as displaying clinically significant issues with hyperactivity, depression, attention problems, and withdrawal and that she rated him as at-risk with regard to conduct problems, anxiety, atypicality, adaptability, social skills, leadership, and activities of daily living. (Tr. at 570–71).  Similarly, Claimant's teacher rated Claimant as displaying clinically significant issues with hyperactivity, depression, and withdrawal and rated him as at-risk with regard to conduct problems, anxiety, attention problems, learning problems, atypicality adaptability, social skills, leadership, study skills, and functional communications.  (*Id*.).  The school psychologist wrote that Claimant's average intelligence did not warrant any special educational needs although Claimant might benefit from support with regard to his deficiencies in written expression.  (Tr. at 572).  The school psychologist also indicated that Claimant may need instruction with regard to how to appropriately manage emotions, frustration, and behaviors in the classroom.  (*Id*.).  Further, the school psychologist wrote that Claimant might benefit from checklists and behavioral charts; that a behavioral specialist could be consulted for strategies to accomplish this; and that Claimant might further benefit from small group instruction, counseling, clear rules, consistent consequences, a behavioral intervention plan, frequent breaks, reduced and modified assignments, extra time for assignments, self-monitoring charts, journaling, and various devices and physical activities designed to reduce anxiety and regulate emotion. (*Id*.).

On April 24, 2015, a meeting was held to discuss developing an IEP for Claimant. (Tr. at 333).  At the time, Claimant was in a full inclusion general education classroom.  (*Id*.).  It was

determined that Claimant was eligible for special education services in the area of Emotional Disturbance and that he would receive services for social and behavioral intervention. (Tr. at 353). To meet those needs, Claimant was placed in a resource room with an intervention specialist and an aide in a separate building in the district. (*Id*.). For a small portion of the day, he would participate in small group instruction with nondisabled peers. (*Id*.).

On October 22, 2015, one of Claimant's teachers, Joshua Chandler, completed a teacher questionnaire. (Tr. at 455–58). On that form, Teacher Chandler marked a box indicating that Claimant was markedly limited with regard to concentration, persistence, and pace even in an accommodated classroom and further wrote that Claimant "gets frustrated with assignments and refuses to do some undesirable activities." (Tr. at 456). Nevertheless, Claimant's grades from the first term of his fourth-grade year reflected that Claimant had a basic understanding with assistance or competence in grade-level expectations in all but two areas covered during that term. (Tr. at 218). Similarly, a report card from Claimant's final term of fifth grade reflected that he received As and Bs in most subjects that year. (Tr. at 253–256).

A February 16, 2017, IEP indicated that Claimant was a hardworking student who wanted to please teachers and classmates and that he sought one-on-one attention from adults and that he enjoyed computer time, time with adults, board games, drawing, karate, playing Minecraft and that he loved to share stories with teachers and staff or aloud to his peers. (Tr. at 925). Further, Claimant did well with starting and completing assignments in all subjects. (*Id*.). Claimant also worked hard when motivated and had a willingness to learn but displayed disrespectful behaviors to teachers and staff, however, when corrected or when asked to complete a less desired task. (Tr. at 928). The record noted that although he did argue back with teachers, he did not yell or use bad words. (Tr. at 925). Although Claimant had thrown, knocked over, or destroyed things in previous

5

years, he had yet to exhibit such behaviors as of October 2016. (*Id*.). Medical records dated March 17, 2016, indicate that Claimant's Mother, Plaintiff, reported that Clamant had improved behaviors at school; that he had been less irritable; and that he twice received a "model student" award. (Tr. at 798). Nevertheless, Claimant's math and art teachers continued to report that Claimant talked during class, did not listen, did not follow directions, and often did not do work because he was distracted.

Educational records reflect that Claimant was enrolled at an on-line school, ECOT, on August 28, 2017. (Tr. at 277). The records reflect that ECOT determined that Claimant qualified for special education services as a student with an emotional disturbance disability. (*Id*.). It was determined that he would need the following accommodations: direct instruction; small groups to maintain focus; extended time and re-direction due to attention, concentration, and focus needs; and frequent breaks to increase on-task behavior. (Tr. at 278).

Claimant started attending Dempsey Middle School on February 1, 2018. (Tr. at 258, 265). The IEP previously done at his online school was amended that same month. (Tr. at 265). Per that amendment, Claimant was to receive instruction in a small group classroom for math and language arts and instruction in the general education classroom for science and social studies. (Tr. at 258). Claimant would also receive the following accommodations in the classroom: extended time, small group, frequent breaks, and cueing. (*Id*.). The records reflect that Claimant's work and production were good in the small group classes and that he asked to be moved to general instruction classrooms for both math and language arts. (Tr. at 269). After a successful trial period, Claimant was moved to a co-taught math class and a general education classroom on February 21, 2018. (Tr. at 269). The records further note that Claimant struggled in the morning when he arrived for social studies and that he was "usually sleepy and hungry," which could have been due to his new

routine attending Dempsey instead of attending classes on-line.  (*Id*.).  Claimant needed to be reminded to get started or to eat and had responded with some verbal confrontation, but he did show compliance with classroom rules after repeated reminders.  (*Id*.).  He also appeared to get along with teachers and classmates although he responded with verbal confrontation before complying when he was moved for being off-task and talking with peers.  (*Id*.).  Claimant's goals included self-identifying when needing assistance and knowing who to ask for help; describing moods or feelings; and complying with teacher requests within a reasonable amount of time.  (Tr. at 258, 261).  Another goal was to be communicating or identifying compensation skills (*e.g.*, taking a break).  (*Id*.).  This goal was set because of Claimant's propensity for leaving class without asking permission and wandering in the hallways after being asked to return to class.  (*Id*.).  Claimant was sent to the office for this infraction as many as one to three times a day.  (*Id*.).

### C.  Relevant Medical Evidence

In February of 2015, Claimant was admitted to the emergency room for treatment for aggression, including kneeing his principal in the chest, and psychiatrically hospitalized until March 23, 2015. (Tr. at 290, 304–305).  Claimant was diagnosed with having PTSD from exposure to trauma.  (Tr. at 290).  Specifically, Claimant witnessed Plaintiff be a victim of domestic violence. (Tr. at 305–06).  The records indicated that Claimant had been treated for ADHD and behavior problems in the past.   (Tr. at 290).  Claimant reported seeing a black figure and a voice telling him to do bad things to people.  (*Id*.).  Plaintiff endorsed that medications had been changed recently and that Claimant had started taking Zoloft in the last month.  (Tr. at 296, 308).  Claimant endorsed difficulty sustaining attention, following directions, listening when spoken to, and being forgetful. (Tr. at 292).   Treatment providers determined that Claimant's medications were not

controlling his symptoms and Adderall was prescribed.  (*Id.*).  Claimant improved, and he was released.  (*Id.*).

Claimant received treatment following his hospitalization.  (Tr. at 315).  His diagnoses of ADD and ODD were upheld and therapeutic school age psychiatric services were recommended. (Tr. at 324).  At appointments for prescription refills in April of 2015, Plaintiff denied having any more hallucinations.  (Tr. at 363).  A note dated April 27, 2015, indicated that Claimant's visual and auditory hallucinations started when he was put on new meds and that they ceased when medications were stopped.  (Tr. at 459).  On May 28, 2015, Plaintiff and Claimant reported that there had been significant improvement over the last 4-8 weeks since starting medication and initiating behavioral therapy.  (Tr. at 370, 72).  A note from June 29, 2015, indicated that Claimant's disruptive behaviors were "stable" and that Claimant was "doing well on Adderall." (Tr. at 377, 379).  On August 26, 2015, Plaintiff reported that she was pleased with how Claimant was doing from a behavioral standpoint and that she believed that he was "much improved on his current medication."  (Tr. at 385, 386).

In October of 2015, Claimant was evaluated by consultative psychological examiner, Margaret G. Smith, MD.  (Tr. 396–99).  At that evaluation, Plaintiff indicated that Claimant had been diagnosed with ADHD, that he had been prescribed Adderall, and that the Adderall helped Claimant concentrate in school.  (Tr. at 397).  Plaintiff also reported that she used to have to fight with claimant to get him to shower but that he has matured, and she may just need to give him a couple reminders. (Tr. at 398).  Claimant did, however, need lots of prompts for tooth brushing and chores.  (*Id.*).  Plaintiff also reported that Claimant liked to draw, play video games, and watch television.  (*Id.*).  Although he had issues with peers in the past, Claimant had a school friend. (*Id.*).  Plaintiff indicated that Claimant could have an "attitude" that turned into a tantrum

consisting of yelling and stomping but that his moods were better when he took his medications and that problems developed when his medications wore off by the end of the day. (*Id*.). Dr. Smith observed that Claimant was appropriately oriented for his age. (*Id*.). Although Claimant was "fidgeting" he agreed to draw a picture of a cake for Plaintiff's birthday; he remained very focused on his drawing; he asked Plaintiff not to look at it and he became upset when he caught her peeking at it. (*Id*.). Claimant was receptive to interacting, responded to questions without hesitation, his speech was completely intelligible, his answers were organized and focused on the topic, and he did not require simplification or repetition. (*Id*.). Claimant indicated that Adderall helped him concentrate in class. (Tr. at 399). Dr. Smith opined that Claimant might need "higher levels of supervision and prompting to stay focused and on task due to the concentration problems and impulsive behaviors." (*Id*.).

On October 15, 2015, reviewing psychologist, Karla Voyten, PhD., reviewed Claimant's file upon initial consideration and opined that that he had marked limitations with regard to attending and completing tasks; less than marked limitations with regard to interacting and relating with others and caring for himself; and no limitations with regard to acquiring and using information, moving about and manipulating objects, and health and well-being. (Tr. at 86–87).

On November 3, 2015, Claimant was seen at the emergency room due to concerns about his aggressive behavior including threatening to harm his family members. (Tr. at 473). He was discharged with a safety plan. (*Id*.). Plaintiff returned with Claimant after his aggressive behaviors increased. (Tr. at 479). Claimant was admitted to the hospital for psychiatric treatment. (Tr. at 478). Plaintiff indicated that Claimant's new stressors included the recent birth of his brother and having to live in a hotel from August of 2015 until October of 2015 due to water damage in their home and that this change in routine appeared to exacerbate his behavioral problems. (Tr. at 488–

9

90).  Claimant was started on sertraline.  (Tr. at 503).  Claimant was engaged in therapy and made clear progress before he was released from the hospital on November 10, 2015.  (Tr. at 492).  Notes from follow-up appointments on various dates in December of 2015, indicated that Claimant was engaged in sessions and responded positively to therapeutic interventions.  (Tr. at 499, 503, 505).  On December 31, 2015, however, Plaintiff indicated that there had not been much change on Claimant's current medications.  (Tr. at 507).  Claimant's Adderall was increased.  (Tr. at 515).  On February 3, 2016, Plaintiff reported a few minor setbacks but a lot of positives since the last session.  (Tr. at 525).  Notes dated February 7, 2016, indicate that Claimant was referred to community-based services.  (Tr. at 528).

On February 29, 2016, reviewing psychologist, Kathleen Malloy, PhD., reviewed Claimant's file upon reconsideration.  (Tr. 91–102).  Dr. Malloy opined that Claimant had marked limitations with regard to health and well-being; less than marked limitations with regard to acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself; and no limitations with regard to moving about and manipulating objects.  (Tr. at 98–99).  When determining that Claimant had less than marked limitations with regard to attending and completing tasks, Dr. Malloy noted that Claimant's behavioral issues are apparently worse at the end of the day when his medications wear off and that although his IEP indicated that Claimant was rarely on task without personal attention, his medications had been increased and currently appeared to be aiding him.  (Tr. at 98).

Records from Claimant's community-based services indicate that Claimant continued to make progress.  For instance, notes from February and March of 2016 indicated that Claimant had a "perfect week" and that Plaintiff and Claimant discussed Claimant's positives that had been happening and identifying what they were doing to lead to successes.  (Tr. at 793, 795).  In March

of 2016, Plaintiff indicated that there had been some decompensation at home, but that school was going very well.  (Tr. at 796, 798).  In April of 2016, Plaintiff indicated that there had been improvement at home and at school.  (Tr. at 813).  Throughout May and June of 2016, Plaintiff and Claimant again discussed positives, successes, and things that had been going well, (Tr. at 823, 825, 828, 830, 831).  Notes nevertheless indicated that Claimant's successes had not been optimal due to Plaintiff's inability to meet more than once a week and inconsistent programming. (Tr. at 833).  Claimant also experienced setbacks in July of 2016, when he was unable to take his medications due to issues with insurance but that things were better after he resumed taking medications in August. (Tr. at 843–44).  Similarly, Claimant experienced problems when his medications were lost during a move in October of 2016. (Tr. at 852).

Medical expert, Dr. Lace, testified via telephone at the July 24, 2018, hearing.  Dr. Lace testified that he had reviewed the available record and concluded that Claimant did not have any impairments that met or medically equaled a Listing Impairment. (Tr. at 72).  In addition, Dr. Lace opined that Claimant had less than marked limitation with regard to acquiring and using information, attending and completing tasks, and interacting and relating with others, and that Claimant had no limitations with regard to moving about and manipulating objects and caring for himself.  (Tr. at 72).

### D.  Summary of the ALJ's Decision

The ALJ first found that Claimant was a school-age child when the application was filed and an adolescent as of the date of the decision.  (Tr. at 15).  Next, the ALJ found that Claimant had not engaged in substantial gainful activity since his application date.  (*Id.*). At the next step of the sequential evaluation process, the ALJ concluded that Claimant had the following severe impairments: depressive, anxiety, personality, neurodevelopmental and trauma- and stressor-

related disorders.  (*Id.*).  The ALJ further found, however, that these severe impairments did not, at any time, meet or medically equal the requirements of any section of the listing requirements, or functionally equal those listing requirements.  (Tr. at 16–17).

The ALJ then reviewed the record evidence and determined that Claimant had marked limitations with regard to interacting and relating with others, but that Claimant had less than marked limitations with regard to acquiring information, attending and completing tasks, caring for himself, and health and well-being; and that Claimant had no limitations with regard to moving about and manipulating objects.  (Tr. at 22–31).  Because benefits cannot be awarded unless there is a finding of one extreme limitation or two marked limitations in one of these six domains, the ALJ denied the claim.  (Tr. at 31).

## II.    STANDARD OF REVIEW

The Sixth Circuit Court of Appeals has summarized the regulations concerning a child's application for disability benefits, stating:

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:

"Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

§ 416.926a (e)(2)(i).

"Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

§ 416.926a (e)(3)(i).

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x. 827, 832 (6th Cir. 2009).

In the context of that legal framework, this Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x. 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.    DISCUSSION

Plaintiff alleges that the ALJ erred when finding that Claimant had less than marked limitations in the domain of "attending and completing tasks."   Claimant alleges that the ALJ's determination was not supported by the evidence because other record evidence, including opinion evidence from consultative examiner Dr. Smith, state agency reviewer Dr. Voyten, and Teacher Chandler, supports a contrary conclusion with regard to Claimant's limitations in this domain. Plaintiff also contends that the ALJ erred by failing to analyze Claimant's hearing testimony and by not properly weighing Plaintiff's hearing testimony.  The Magistrate Judge finds that the ALJ did not commit reversible error.

### A.    The ALJ's Attending and Completing Tasks Determination is Supported by Substantial Evidence

The attending and completing tasks domain refers to how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities.   20 C.F.R. § 416.926a(h).  The pertinent regulations provide that a school-age child (ages 6 to 12) without an impairment should be able to focus his attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments.  The child should be able to concentrate on details and not make careless mistakes in his work (beyond what would be expected in other children of the same age who do not have impairments).  The child should be able to change activities or routines without distraction and stay on task and in place when appropriate.  The child should be able to sustain attention well enough to participate in group sports, read by himself, and complete family chores.  The child should also be able to complete a transition task (*e.g.*, be ready for the school bus, change clothes

14

after gym, change classrooms) without extra reminders and accommodation.  20 C.F.R. § 416.926a(h)(2)(iv).[1]

Social Security regulation 20 C.F.R. § 416.926a(h)(3) sets forth examples of limited functioning in this domain that children of various ages might exhibit.  These examples cover a range of ages and developmental periods and do not necessarily describe "marked" or "extreme" limitations in this domain.  The examples of limitations in this domain are: (i) being easily startled, distracted, or over-reactive to sounds, sights, movements, or touch; (ii) slow to focus on, or failing to complete, activities of interest (e.g., games or art projects); (iii) repeatedly becoming side-tracked from activities or frequently interrupting others; (iv) being easily frustrated and giving up on tasks, including ones he is capable of completing; or (v) requiring extra supervision to remain engaged in an activity.

The ALJ analyzed the evidence and concluded that Claimant was less than markedly limited in the domain of attending and completing tasks.  (Tr. at 25).  He set forth his analysis as follows.

> The claimant has less than marked limitations in attending and completing tasks. The claimant has an IEP in school, and he has demonstrated hyperactivity, impulsivity, and inattention with grade problems at times . . . . The claimant also demonstrated problems with following directions at times . . . . However, the claimant has satisfactory homework performance . . . . The claimant's scores on standardized achievement testing are nearly all in the average range . . . . The evidence documents that the Claimant is artistically and musically talented . . .  The claimant maintains sufficient attention to regularly engage in activities such as building with [LEGOs], drawing, playing board and video games,

---

[1] The regulations also provide that an adolescent (age 12 to age 18) should be able to pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, and independently plan and complete long-range academic projects.  The adolescent should also be able to organize materials and plan time in order to complete school tasks and assignments.  In anticipation of entering the workplace, adolescents should be able to maintain attention on a task for extended periods of time, and not be unduly distracted by peers or unduly distracting to them in a school or work setting.  20 C.F.R. § 416.926a(h)(v).  Because Claimant was a school aged child when the application was filed and an adolescent at the time of the hearing, both provisions are recited.

> using computers and smart phones, and watching television . . . . the claimant enjoys acting . . . The claimant's neurodevelopmental disorder and related symptoms are stable, tolerable, and well controlled with prescribed treatment, with improved concentration . . . The claimant repeatedly presented as alert and oriented, with appropriate, good, intact, linear, logical, and normal associations, attention span, concentration, eye contact, insight, judgment, recent and remote memory, and thought content processes . . . . The claimant was oriented at the September 2015, psychological consultative examination, and he responded to questions with focused and organized answers and no hesitation, and did not required [*sic*] repetition and simplification of questions . . . . The claimant focused on drawing a good picture as well at that time . . .

(Tr. at 25).

The Magistrate Judge finds that substantial evidence supports the ALJ's determination about this domain. The ALJ explained that Claimant's academic abilities demonstrated an ability to attend to and complete tasks. The records reveal that Claimant scored in average ranges on general intelligence and achievement tests, had average to good grades, and did well academically, all of which demonstrated an ability to attend to and complete tasks. (Tr. at 218, 253–56, 565–66. 568). Claimant's work and production were also good in the small group classes at Dempsey, and he was successfully moved to general instruction classrooms for both math and language arts. (Tr. at 269). The ALJ also explained that Claimant enjoyed activities that required sustained attention— the record indicates that Claimant enjoyed board games, drawing, karate, and playing videogames. (Tr. at 49, 925). The ALJ reasoned that Claimant's neurodevelopmental disorder and related symptoms were well controlled. The record evidence demonstrates that Claimant experienced improvements when he was able to take his medications, his ADHD was generally well-controlled, and that Claimant acknowledged that Adderall helped him concentrate in school. (Tr. at 379, 389, 397, 843–44). *See Smith v. Comm'r of Soc. Sec.*, 564 F. App'x. 758, 763 (6th Cir. 2014) (finding that improvement in ADHD symptoms after taking prescribed medication supports a denial of disability benefits). Moreover, as the ALJ explained, Claimant's mental status

examinations were routinely normal. The record contains numerous normal examination results and a number that also indicate that Claimant displayed no issues with attention or concentration. (Tr. at 323–24, 483, 493, 961, 966, 972, 978, 984, 990, 996, 1002, 1008, 1020, 1028). Moreover, reviewing psychologist Dr. Malloy opined on reconsideration that Claimant had less then marked limitations in this domain. (Tr. at 98). Dr. Lace also opined that Claimant had less than marked limitations in this domain. (Tr. at 72). Thus, the ALJ's determination about this domain was amply supported.

Plaintiff contends that the ALJ's analysis is not substantially supported because other record evidence could support a contrary conclusion. In particular, Plaintiff points to the opinion from consultative examiner, Dr. Smith—who opined that Claimant would need higher levels of supervision and prompting to stay focused and on task because of concentration and impulsivity issues— and to the opinion from initial state agency reviewer, Dr. Voyten—who opined that Claimant had marked limitations in this domain. As noted, however, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakely*, 581 F.3d at 406 (quoting *Key*, 109 F.3d at 273); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotations omitted). In this case, the ALJ concluded that the opinions from Drs. Smith and Voyten were entitled to little weight because the evidence documented less limitations in this domain that either doctor opined. (Tr. at 21, 20). In contrast, Dr. Malloy and testifying medical expert Dr. Lace both opined that Claimant had less than marked limitations in this domain. (Tr. at 98, 72). The ALJ expressly found that the opinions from Drs. Malloy and Lace were more consistent with the totality of the evidence and thus that their opinions about this domain were entitled to great weight. (Tr. at 25). It was within the ALJ's province to resolve that conflict.

Plaintiff also contends that the ALJ erred because he "summarily disregarded" Teacher Chandler's opinion that Claimant had marked limitations in this domain. Opinions from non-medical sources, including educational personnel, are governed by 20 C.F.R. § 416.927(f). *See* 20 C.F.R. § 416.913(a) & (d)(2) (effective Sept. 3, 2013); SSR 06-03p,[2] 2006 WL 2329939, at *3 (S.S.R. Aug. 9, 2006) ("Non-medical sources" who have had contact with a claimant in their professional capacity include teachers). The Commissioner has indicated that an ALJ should generally explain the weight given to opinions from other sources, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of a case." *Id.* at *4, 6. An ALJ need not, however, provide "good reasons" for rejecting the opinions of non-medical sources, including teachers. *See* 20 C.F.R. § 416.927(c)(2) ("good reasons" are only required when an ALJ provides less than controlling weight to a treating source's medical opinion). In this case, the ALJ specifically indicated that Teacher Chandler's opinion was entitled to little weight because there was no evidence that Claimant had functional limitations and restrictions to the extent that Teacher Chandler opined. (Tr. at 22). It is thus clear that the ALJ considered Teacher Chandler's opinion, and the ALJ's analysis was consistent with the Regulations.

For these reasons the Magistrate Judge finds that the ALJ did not commit reversible error when he determined that Claimant had less than marked restrictions with regard to attending and completing tasks.

---

[2] Effective March 27, 2017, SSR 06-03p has been rescinded by Fed.Reg.Notice Vol. 82, No. 57. Page 15263. But it is still effective for claims, like this one, filed before that date.

**B.      The ALJ Did Not Commit Reversible Error When Analyzing and Weighing Hearing Testimony**

Plaintiff next contends that the ALJ erred by failing to mention Claimant's hearing testimony and by failing to weigh it properly.  The Magistrate Judge finds that this alleged error is without merit.

When the claimant is a child under the age of eighteen and cannot adequately describe his symptoms, an ALJ accepts the testimony from the person most familiar with the child's condition, such as a parent.  *Briggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1239 (10th Cir. 2001).  In such cases, "the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying."  *Id.*; *Simon on behalf of K.A.W. v. Colvin*, No. 3:13-cv-01245, 2017 WL 3184481, at *2 (M.D. Tenn. June 22, 2017); *Edwards on behalf S.E. v. Comm'r of Soc. Sec.*, No. 12-cv-1088, 2017 WL 1493112, at * 7 (W.D. Tenn. April 6, 2017), *adopted by*, 2017 WL 1483564, (W.D. Tenn. April 25, 2017).   The failure to make such credibility findings can undermine the Commissioner's argument that there is substantial evidence adequate to support the conclusion of no disability.  *See Williams on Behalf of Williams v. Bown,* 859 F.2d 255, 261 (2d Cir. 1988).

!      When making a credibility determination, "[t]he ALJ may not 'make a single conclusory statement that . . . 'the allegations are (or are not) credible.'"  *Saddler v. Comm'r of Soc. Sec.,* No. 98-5440, 1999 WL 137621, at *2 (6th Cir. March 4, 1999).  If the ALJ rejects testimony as incredible, he must give reasons for doing so.  *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).  The determination must also be sufficiently specific to make clear the weight that the ALJ gave to an individual's statements and reasons for that weight. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).  "In other words, blanket assertions that the claimant is not

believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Id*.

At base, however, the Court must "'accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oe]s not, of observing a witness's demeanor while testifying.'" *Johnson v. Comm'r of Soc. Sec.*, No. 18-10927, 2019 WL 2051966, at *10 (E.D. Mich. Feb. 25, 2019), *report and recommendation adopted sub nom. Johnson o/b/o T.C.M.J. v. Comm'r of Soc. Sec.*, No. 18-10927, 2019 WL 1397242 (E.D. Mich. Mar. 28, 2019) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)). "Thus, an ALJ's credibility determination will not be disturbed 'absent compelling reason.'" *Johnson*, 2019 WL 2051966, at *10 (quoting *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2011)).

In this case, Plaintiff testified that Claimant had conflicts with others and that he needed to be redirected to do basic tasks.  (Tr. at 60–61, 63, 64).  Plaintiff also testified that she was not entirely sure if Claimant had trouble focusing or if he had issues with authority or impulsivity. (Tr. at 64).  The ALJ analyzed Plaintiff's testimony as follows:

> The statements and testimony of the claimant's mother are overall entitled to partial weight . . . The claimant's mother describes the claimant as brilliant, loveable, and able to perform most activities in taking care of personal needs, with no physical limitations, communications problems, and difficulties progressing in learning . . . as discussed below.  These statements are generally consistent with the totality of the evidence, as discussed below, and entitled to significant weight to that extent. However, the remainder of these statements is entitled to little weight as there is no evidence documenting that the claimant has functional restrictions to the extent this source suggests.  Accordingly, the statements and testimony of the claimant's mother are overall entitled to partial weight in assessing his functional limitations and restrictions as of the application date.

(Tr. at 22).

!	The ALJ thus made clear certain statements from Plaintiff that were consistent with the record were assigned significant weight while Plaintiff's other statements were assigned little

weight.  The ALJ also made it clear that the statements that received less weight were discounted because the record did not evidence that Claimant was as limited as Plaintiff suggested.  This explanation was supported by the record evidence, which the ALJ discussed in detail.  The ALJ's discussion, though relatively short, was sufficient.  *See, e.g.*, *Johnson*, 2019 WL 2051966, at *10 (citation and quotation marks omitted) (holding that there was "no compelling reason to disturb the ALJ's credibility determination" and noting that such determinations are "peculiarly within the province of the ALJ").

## IV.    CONCLUSION

For the reasons set forth above, the Magistrate Judge **RECOMMENDS** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's determination be **AFFIRMED**.

## V.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this R&R, that party may, within fourteen (14) days, file and serve on all parties objections to the R&R, specifically designating this R&R, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the R&R will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of

district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted).

   **IT IS SO ORDERED.**

Date: April 27, 2020        /s/ Kimberly A. Jolson
              KIMBERLY A. JOLSON
              UNITED STATES MAGISTRATE JUDGE